IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN DUGAN, AURORA DUGAN, and MATTHEW TAPSCOTT, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>LLOYDS TSB BANK, PLC.,<br><br>Defendant.<br>_____/<br>DAVID OSMENA and PATRICIA HOGAN-OSMENA, husband and wife, and on behlaf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>LLOYDS TSB BANK, PLC.,<br><br>Defendant.<br>_____/ | No. C 12-02549 WHA<br><br>Related to:<br><br>No. C 12-02937 WHA<br><br><br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS, AND VACATING MOTION HEARING** |

**INTRODUCTION**

In these two related actions, defendant moves to dismiss all claims. For the reasons discussed below, defendant's motions are **GRANTED IN PART** and **DENIED IN PART**. The motion hearings scheduled for September 20 are **VACATED**. The case management conferences remain on calendar for that day but are rescheduled to 11:00 a.m.

**STATEMENT**

In both the *Dugan* and *Osmena* actions, defendant is Lloyds TSB Bank, PLC, a bank organized under the laws of the United Kingdom with branches in New York and Hong Kong. Beginning in 2006, Lloyds offered dual currency loans. These loans had the following features: *First*, loans were made in U.S. dollars but could be redenominated into Yen, as determined by the borrower. *Second*, the interest rate was set at 1.5% above a "Cost of Funds," which was defined as "the cost in respect of any currency expressed as a percentage rate of funding for maintaining the loan or loans in that currency as *conclusively nominated by Lender from time to time*" (Dugan Compl. ¶ 18, Exh. 1) (emphasis added). *Third*, upon redenomination into Yen, the principal balance of the loan was subject to a contractual safety "cap" of approximately 20% above the original loan amount in Dollars. The relevant loan provisions stated (Dugan Compl. ¶ 17, Exhs. 1) (emphasis added):

> Notwithstanding the foregoing, in the event the loan is redenominated, *any fluctuation in the value of the currency from time to time shall not result in a principal sum* which exceeds $[20% above the original loan amount]
>
> \*        \*        \*
>
> In the event Borrower redenominates the currency in which the Advance has been made, the value of the currency may increase up to the maximum sum of $[20% above the original loan amount.]

And *fourth*, the loans were secured by plaintiffs' non-primary residential properties (Dugan Compl. ¶¶ 2–4).[1]

Plaintiffs in both actions are individuals residing in California (Dugan Compl. ¶¶ 5,6; Osmena Compl. ¶ 11). In 2007, plaintiffs, in separate transactions, took out approximately six million dollars in loans from Lloyds secured by their properties (Dugan Compl. ¶¶ 41, 56, Exhs. 1–4; Osmena Compl. ¶ 14, Exhs. 1–4).[2]

Shortly after plaintiffs entered into these loans, they redenominated their loans from Dollars into Yen (Dugan Compl. ¶¶ 42, 57). The redenomination was done in reliance on the

---

[1] Similar allegations appear in the *Osmena* complaint (Osmena Compl. ¶¶ 2–4, Exh. 1).

[2] Named plaintiffs are John Dugan, Aurora Dugan, and Matthew Tapscott in the *Dugan* action. Named plaintiffs are David Osmena and Patricia Hogan-Osmena in the *Osmena* action.

2

loan agreement provisions regarding interest rate and principal cap, quoted above (*id.* ¶¶ 43, 58). Following redenomination, the exchange rates began to drop dramatically, *i.e.*, significant depreciation of the Dollar against the Yen (*id.* ¶¶ 45, 59). This meant that the loans' principal sum in Dollars increased. Take this hypothetical for example: a loan issued in 2007 for one million dollars. In 2007, when the exchange rate was 100 Yen per Dollar, the borrower redenominated his loan into one hundred million Yen. Interest payments were made by multiplying the interest rate (determined by Lloyds) and the principal sum of the loan (one hundred million Yen). Assuming that Lloyds determined the annual interest rate to be three percent, the interest payments would have been three million Yen per year. By 2011, however, the Dollar depreciated against the Yen, making the exchange rate 75 Yen per Dollar. Thus, by 2011, the principal sum of the loan would be equivalent to 1.3 million dollars (assuming a constant one hundred million Yen principal balance). Mathematically, 1.3 million dollars is greater than 20% of one million dollars. Lloyds, however, would continue charging interest payments based on three percent of the principal balance in Yen even though that balance is greater than 20% of the original loan amount in Dollars. Plaintiffs allege that this practice allegedly violated the contractual provisions capping the principal amount at 20% of the original amount in Dollars (*id.* ¶¶ 20–25, 50, 61). Plaintiffs also allege that Lloyds arbitrarily increased the interest rates by tripling its "Cost of Funds" (*id.* ¶ 30). This was allegedly a breach of Lloyds' fiduciary duty to plaintiffs because standard indexes for interest rates, such as the Tokyo Interbank Offered Rate ("TIBOR"), actually decreased during the period Lloyds increased its interest rates (*id.* ¶¶ 31–35).[3]

Lloyds also told borrowers that they could avoid further currency fluctuations if they converted their loans back to Dollars (Dugan Compl. ¶¶ 28, 29, 45). In response to that solicitation, plaintiffs redenominated their loans back to Dollars. Lloyds allegedly never disclosed to plaintiffs that switching back to Dollars would lock in the borrowers' currency loss (*id.* ¶ 29). Lloyds also allegedly concealed that converting back to Dollars served to benefit only Lloyds if the loans had hit the principal cap of 20% above the original loan amount.

---

[3] Similar allegations appear in the *Osmena* complaint (Osmena Compl. ¶¶ 18–24).

1  Plaintiffs in both actions bring class claims on behalf of nationwide and California
2  classes, with various subclasses. Lloyds now moves to dismiss both actions.

## ANALYSIS

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). In addition to the allegations in the complaint, the court may consider documents incorporated by reference in plaintiff's complaint. *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 925 n.2 (9th Cir. 2003). A claim is facially plausible when there are sufficient factual allegations to draw a reasonable inference that the defendant is liable for the conduct alleged. While a court "must take all of the factual allegations in the complaint as true," it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 1949–50 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)) (internal quotation marks omitted). "[C]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996) (citation omitted).

### 1. BREACH OF CONTRACT.

In both actions, plaintiffs allege that Lloyds breached the loan agreements by not capping the principal balance in Dollars. Again, the relevant loan provisions stated (Dugan Compl. ¶ 17, Exh. 1) (emphasis added):

> Notwithstanding the foregoing, in the event the loan is redenominated, *any fluctuation in the value of the currency from time to time shall not result in a principal sum* which exceeds $[20% above the loan amount]
>
> \*   \*   \*
>
> In the event Borrower redenominates the currency in which the Advance has been made, the value of the currency may increase up to the maximum sum of $[20% above loan amount.]

Plaintiffs allege that Lloyds breached the 20% cap provision by applying an interest rate to an uncapped principal. As alleged, Lloyds' demand of interest payments did not cap fluctuations

United States District Court
For the Northern District of California

4

due to depreciation in currency values. These allegations are sufficient for a claim of breach of contract.[4]

Lloyds argues that because other sections of the loan agreement gave Lloyds sole discretion to determine interest rates, quoted above, it did not breach the 20% cap of the principal sum. This argument is unpersuasive. The loan agreements may have given to Lloyds discretionary determination over the interest *rate* but not discretionary determination of the *principal sum* to apply that interest rate to. While arguably true that discretion over the interest rate ultimately gives some discretion over the amount of interest payments, it is nevertheless important for borrowers to know whether Lloyds is increasing their interest payments by inflating its interest rates or the loan's principal sums.

Lloyds also cites to other documents comprising the loan agreements that warned borrowers they "will be solely and unconditionally liable" for losses "due to adverse movement in exchange rate" (Dugan Compl. Exh. 4; Osmena Compl. Exh 4). Without explaining why, Lloyds argues that this language supplants the contractual provisions for a 20% cap on the principal sum. Relying again on other documents in the loan agreements, Lloyds argues for a different interpretation of the cap provision: that the cap is on the amount of principal that must be secured by real property and not a cap on the total amount of indebtedness. Lloyds' argument is unpersuasive. At this stage, because it is unambiguous which contractual provision is subordinate to the other, the complaint cannot be dismissed for failure to state a claim.

Therefore, Lloyds' request to dismiss the breach of contract claims is **DENIED**. This ruling for plaintiffs is based on the liberal Rule 12 standard and does not necessarily mean plaintiffs will prevail under Rule 56.

**2. TORTIOUS BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.**

Only the *Dugan* plaintiffs bring a claim for tortious breach of the implied covenant of good faith and fair dealing.

---

[4] Similar allegations appear in the *Osmena* complaint (Osmena Compl. ¶¶ 48–53, Exh. 1).

### A. BREACH.

Under California law, every contract "imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.*, 2 Cal. 4th 342, 371 (1992). "The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith." *Id.* at 372.

> In [*Marathon*], the California Supreme Court held that defendant lessor's exercise of a lease provision — which granted the lessor the absolute right to terminate the lease on the lessee's request to sublet a portion of the premises — was not a breach of the covenant of good faith and fair dealing because this act was expressly authorized by the lease provision and was within the reasonable expectations of the parties. *Id.* at 371. While it is true that the court held that "as a general matter, implied terms should never be read to vary express terms," *id.* at 374, the court found it crucial that the conduct covered by the express provision of the contract was within the parties' legitimate expectations. In [*Marathon*], the court found that the only incentive for terminating the lease would be in the hopes of receiving a higher rent from a new lessee. Since that was the only purpose of having the express provision, it could not be said that exercising it for this purpose was contrary to any reasonable expectation of the plaintiff and was a violation of the implied covenant.

*IndyMac Federal Bank, F.S.B. ex rel. F.D.I.C. v. PMI Mortg. Ins. Co.*, Civ. 08-4303, 2009 WL 331451, at *2 (N.D. Cal. 2009) (Alsup, J.)

*Dugan* plaintiffs have adequately alleged their claim for breach of the implied covenant of good faith and fair dealing. The loan agreement gave Lloyds discretion to determine the loan's interest rates, which was set at 1.5% above a "Cost of Funds," which was defined as "the cost in respect of any currency expressed as a percentage rate of funding for maintaining the loan or loans in that currency as *conclusively nominated by Lender from time to time*" (Dugan Compl. ¶ 18, Exh. 1) (emphasis added). Plaintiffs allege that Lloyds breached its duty by arbitrarily increasing the interest rates while standard indexes for interest rates, such as the Tokyo Interbank Offered Rate ("TIBOR"), decreased (*id.* ¶¶ 31–35). Plaintiffs allege that Lloyds deliberately charged higher interest rates, for purposes of greed rather than costs of maintenance, even as comparable indexes were decreasing. These allegations, taken as true, are sufficient to find that there was a breach of good faith and fair dealing because borrowers would not have reasonably

6

expected their variable interest rate to increase as comparable rates, which Lloyds itself can borrow at, are decreasing (Dugan Compl. ¶¶ 30–32).

### B. Remedy in Tort.

> Generally, no cause of action for the tortious breach of the implied covenant of good faith and fair dealing can arise unless the parties are in a "special relationship" with "fiduciary characteristics." Thus, the implied covenant tort is not available to parties of an ordinary commercial transaction where the parties deal at arms' length. A central test of whether a lender is subject to this tort is whether there is "a fiduciary relationship in which the financial dependence or personal security by the damaged party has been entrusted to the other."

*Pension Trust Fund for Operating Engineers v. Federal Ins. Co.*, 307 F.3d 944, 955 (9th Cir. 2002) (citations omitted).

Plaintiffs adequately plead that they are entitled to tortious remedy. As alleged, the loan agreements left one of the most important aspect of a loan, the interest rate, "to be conclusively nominated by the Lender from time to time" (Dugan Compl. Exh. 1). Also, Lloyd's FAQ explanation to borrowers on how it calculated the interest rate was circular and opaque (Dugan Compl. Exh. 5):

> Q: How is my interest rate calculated?
>
> A: The interest rate you pay is made up of two elements; (i) the Cost of Funds (which relates to your choice of currency) and (ii) the Margin (which relates to the location in which your property is situated).
>
> Q: Are you increasing my margin? I thought this remained constant for the life of the loan.
>
> A: We are not increasing your margin. We are increasing the Cost of Funds element within your interest rate.
>
> Q: How do I calculate my Cost of Funds?
>
> A: By deducting your loan margin rate from the overall interest rate.

Plaintiffs also allege that the loan agreements were contracts of adhesion not subject to negotiation and heavily favored Lloyds. (Dugan Compl. ¶¶ 17–18). Plaintiffs took out large loans for millions of dollars, raising public concerns because all loans were secured by real property and have resulted in foreclosures (Dugan Compl. ¶ 130). Therefore, as alleged,

7

plaintiffs' financial dependence were entrusted to Lloyds because Lloyds had sole discretion in adjusting the interest rate and did not adequately explain how interest rates were to be determined. At this motion to dismiss stage, plaintiffs' allegations are sufficient to establish that the parties were in a special relationship with fiduciary characteristics. Therefore, Lloyds' request to dismiss the tortious breach of implied covenant of good faith and fair dealing is **DENIED**. This ruling for plaintiffs is based on the liberal Rule 12 standard and does not necessarily mean plaintiffs will prevail under Rule 56.

### 3. SECTION 17200 CLAIM.

Plaintiffs in both actions bring claims under California's UCL, which prohibits acts of unfair competition, including "any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue, or misleading advertising." CAL. BUS. & PROF. CODE § 17200. Our court of appeals has held that a UCL claim under the "unfair" prong may follow the *South Bay* standard. *Lozano v. AT&T Wireless Services, Inc.*, 504 F.3d 718, 736 (9th Cir. 2007). In *South Bay*, the California Court of Appeal held that:

> "The 'unfair' standard, the second prong of section 17200" offers "an independent basis for relief." "This standard is intentionally broad, thus allowing courts maximum discretion to prohibit new schemes to defraud. The test of whether a business practice is unfair 'involves an examination of [that practice's] impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer. In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim . . . .' " In *People v. Casa Blanca Convalescent Homes, Inc.*, we concluded "an 'unfair' business practice occurs when it offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." "In general the 'unfairness' prong 'has been used to enjoin deceptive or sharp practices....'" However, the "unfairness" prong of section 17200 "does not give the courts a general license to review the fairness of contracts . . . ."

*South Bay Chevrolet v. General Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 886–87 (1999).

Here, plaintiffs generally allege that Lloyds' practices were unfair because it:

(1) Drafted agreements promising a cap on the principal balance, but collected interest payments in violation of that promise.

8

1   (2)   Drafted agreements promising that its calculation of the Cost of Funds would not
2         be done in an arbitrary manner, or, at least not in complete divergence from
3         international indexes, but collected interest payments in violation of that promise.
4   (3)   Omitted material information by not disclosing that its calculation of Cost of
5         Funds could not be prospectively calculated by the borrower.
6   (4)   Provided an opaque and circular explanation to borrowers about calculations of
7         interest rates.
8   (5)   Encouraged borrowers to redenominate back to Dollars when it was clearly in
9         borrowers' detriment to do so.
10  (6)   Omitted material information by not showing outstanding principal balances in
11        Dollars. Specifically, concealing risk by issuing quarterly statements showing
12        only the Yen values, the amount of quarterly interest due, and the applicable
13        interest rate.

As alleged, these unfair practices have had a significantly impact on its alleged victims in the form of foreclosures. Lloyds has not argued that it had compelling justifications and motives for its alleged wrongdoing. Therefore, plaintiffs have adequately pled their UCL claim.

Lloyds argues that plaintiffs have failed to show an injury-in-fact. Specifically, Lloyds argues that plaintiffs must allege facts showing also that Lloyds is in possession of money or property lost as a result of an unfair act. Plaintiffs' allegations have done so. As stated in their complaint, plaintiffs have suffered two primary forms of monetary loss: (i) payments of interest based on principal amounts above the cap; and (ii) payments of interest based on arbitrary increases in Lloyds' interest rates (Dugan Compl. ¶¶ 50–51, 61–62; Osmena Compl. ¶¶ 24, 25). These payments were collected by Lloyds (*see* Dugan Compl. ¶¶ 23; Osmena Compl. ¶¶ 20).

This ruling for plaintiffs is based on the liberal Rule 12 standard and does not necessarily mean plaintiffs will prevail under Rule 56.

**4.   CLAIMS GROUNDED IN FRAUD.**

Plaintiffs in both actions bring claims grounded in fraud. Rule 9(b) requires that the circumstances constituting fraud must be stated with particularity. "Averments of fraud must be

9

accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Vess. v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2001) (citation omitted). "[M]erely identifying a period spanning several months does not adequately identify the time of the misrepresentations." *Atlantic Richfield Co. v. Ramirez*, 176 F.3d 481 (9th Cir. 1999). The complaint needs to state "the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 558 (9th Cir. 2010). In *Sanford*, our court of appeals held that allegation of receiving deceptive sales scripts over the telephone required husband-and-wife plaintiffs to allege "which of them made any of the telephone calls to purchase the various bait products and, thus, who was a party to the alleged misrepresentations." *Ibid.* With regard to allegations that the corporate defendant generally mailed deceptive membership kits, failure to allege any specific mailings was fatal. *Ibid.*

Here, plaintiffs in both actions have failed to allege with sufficient particularity how Lloyds fraudulently induced plaintiffs to enter into the loans. In particular, plaintiffs have failed to allege how they came to know of the loans, which of them spoke with a Lloyds agent, and whether a Lloyds agent explained to them the terms of the loan agreement. It is insufficient to allege tersely, as the complaints do, that plaintiffs "began discussing with Defendant the possibility of obtaining a Dual Currency Loan" in 2006 or 2007, and subsequently borrowed money pursuant to the loans (Dugan Compl. ¶¶ 40–41, 55–56; Osmena Compl. ¶¶ 14–15).

The appended loan agreements do not cure the pleading deficiencies. While the Dugans have appended their purported loan agreements to the complaint, none of the agreements are signed (Dugan Compl. Exhs. 1–3), and therefore, fail to specify the time of the misrepresentation. With respect to Tapscott's agreement, only plaintiff's signature appears and it is unclear when Lloyds made the misrepresentation (Dugan Compl. Exh. 4). While there is a single letter signed by Lloyds addressed to Tapscott, plaintiffs' complaint does not allege that language from that letter was fraudulent (Dugan Compl. Exh. 4 at H1642507). So too for plaintiffs in the *Osmena* action (Osmena Compl. Exhs 1–4). Furthermore, plaintiffs in both actions have not alleged the place where the misrepresentations took place.

10

1       These details are especially important because Lloyds will defend claims of fraud by
2  arguing that many of its borrowers had been introduced to the loans and given information and
3  advice regarding them from independent personal financial consultants — not Lloyds.

4       Plaintiffs in the *Dugan* action have also failed to sufficiently alleged other fraudulent
5  acts. In particular, the Dugans allege that Lloyds misrepresented in emails and other
6  communications that redenominating back to Dollars would negate further risk (Compl. ¶¶
7  28–29, 45). Plaintiffs have failed to append any of the correspondence sent by Lloyds that made
8  these allegedly deceptive communications. Plaintiffs have also failed to specific what particular
9  statements, made by whom and when, induced them to switch back to Dollars. Plaintiffs have
10 also failed to adequately allege that quarterly statements, which purportedly did not show Dollar
11 amounts, fraudulently concealed risk. Not one of these quarterly statements is appended to the
12 complaint and no details are given about the statements or plaintiffs reliance on any
13 particular statement.

14      For Rule 9(b), it is insufficient to generally allege that the written loan agreements were
15 drafted by Lloyds, that these documents bear dates, and have the word "Lloyds" on them. While
16 our court of appeals has occasionally relaxed the Rule 9(b) particularity requirement where
17 "plaintiffs cannot be expected to have personal knowledge of the relevant facts," *Neubronner v.*
18 *Milken*, 6 F.3d 666, 672 (9th Cir. 1993), here, it is not unreasonable to expect plaintiffs, who
19 somehow discovered and entered into these large loans using their real property, to have
20 personal knowledge of the relevant facts.

21      Claims one, two, five, and seven in the *Dugan* complaint; and claim four in the *Osmena*
22 complaint are exclusively grounded in fraud. All averments of fraud, including the claims
23 identified above, are **DISMISSED WITH LEAVE TO AMEND**.

11

**CONCLUSION**

For the reasons stated above, defendant's motions to dismiss are **GRANTED IN PART** and **DENIED IN PART**.  The motion hearings scheduled for September 20 are **VACATED**.  The case management conferences remain on calendar for that day but are rescheduled to 11:00 a.m. Plaintiffs in both actions may seek leave to amend and will have **21 CALENDAR DAYS** from the date of this order to file a motion, noticed on the normal 35-day track, for leave to file an amended complaint in order to further develop their claims.  A proposed amended complaint must be appended to the motions and plaintiffs must plead their best case.  The motion should clearly explain how the amendments to the complaint cure the deficiencies identified herein. This is not an invitation to add new claims.

**IT IS SO ORDERED.**

Dated:   September 5, 2012.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

12